UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


SUSAN BIGGS BY AND THROUGH
CONSERVATOR, PARENT AND NEXT
FRIEND, HAROLD BIGGS                                         PLAINTIFF

VS.                                    CIVIL ACTION NO.3:15CV452TSL-RHW

EDWIN C. LEGRAND III,
PAUL A. CALLENS, AND
JOHN DOES 1-10                                              DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants
Edwin LeGrand and Paul Callens for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff Susan
Biggs, by and through conservator, parent and next friend, Harold
Biggs, has responded in opposition to the motion.  The court,
having considered the memoranda of authorities, together with
attachments, submitted by the parties, concludes that defendants'
motion is well taken and should be granted.

Forty-nine year old Susan Biggs, who is currently receiving
long-term psychiatric care at the Mississippi State Hospital at
Whitfield, has a long history of mental illness and of involuntary
commitments to Mississippi's state-run psychiatric hospitals due
to her mental illness.  Through her parent and next friend, she
filed the present action under 42 U.S.C. § 1983 against Edwin C.
LeGrand III, former Director of the Mississippi Department of
Mental Health, which operates the state's psychiatric hospitals,

and against Paul C. Callens, Director of North Mississippi State Hospital, alleging that their actions and/or decisions regarding provision of care during her involuntary commitment at North Mississippi State Hospital (NMSH) in 2012 resulted in her being denied her "right to appropriate treatment, minimally adequate habilitation, and her historic liberty interests" in "safety, well-being, liberty and freedom of movement."[1]  More particularly, she charges that defendants violated her Fourteenth Amendment substantive and procedural due process rights by discharging her from an involuntary, inpatient commitment at NMSH to live independently in the community, without any referral for community services or follow-up, when they knew or should have known she was in need of continued services and treatment and that she was incapable of living independently.[2]  She alleges that defendants' "grossly negligent and unconstitutional actions and inactions" in this regard had disastrous consequences for her, mentally,

---

[1]     "Section 1983 provides a civil remedy in federal court for violations, under color of state law, of a person's constitutionally recognized rights, privileges, or immunities." Klingler v. Univ. of S. Mississippi, USM, 612 F. App'x 222, 227 (5th Cir. 2015) (quoting Bledsoe v. City of Horn Lake, Miss., 449 F.3d 650, 653 (5th Cir. 2006)).

[2]     In addition to her federal claim, plaintiff alleged that defendants violated her rights under the Mississippi Constitution. The court previously dismissed plaintiff's state law official and individual capacity claims against defendants based on Eleventh Amendment immunity.  See Biggs v. LeGrand, et al., No. 23:15CV452TSL-RHW, 2016 WL 280288 (S.D. Miss. Jan. 21, 2016).

emotionally, physically and financially, for which she is entitled to recover from them compensatory and punitive damages.

    Defendants' Motion

    The court previously dismissed plaintiff's official capacity claims against defendants on the basis of Eleventh Amendment immunity.[3]  Defendants have now moved for summary judgment in their individual capacities on the basis of qualified immunity. Plaintiff opposes the motion.

    Background

    Plaintiff's history of involuntary commitments to the State's psychiatric hospitals began in August 1995, when she was first involuntarily committed to East Mississippi State Hospital (EMSH) in Meridian, Mississippi.  After a month at EMSH, she was discharged, with follow-up treatment at the local mental health clinic.  Over the next twelve years, she was involuntarily committed to EMSH sixteen times.[4]  Time and again, she was either discharged or released on an outpatient commitment order, only to

_____

    [3]    Id.

    [4]    She was committed to EMSH from January 1996 to March 1996; May 1996 to July 1996; January 1997 to February 1997; March 1998 to April 1998; June 1998 to July 1998; October 1998 to January 1999; October 1999 to December 1999; January 2000 to May 2000; September 2001 to February 2003; March 2003 to April 2003; June 2003 to July 2003; September 2003 to October 2003; September 2005 to May 2006; August 2006 to October 2006; December 2006 to November 2007; January 2008 to December 2011.

be re-admitted a few weeks or months or, on a couple of occasions, up to a year or year-and-a-half later.  That was the pattern until January 2008, when she was involuntarily committed to long-term care at EMSH.  Upon that admission, plaintiff remained at EMSH under long-term care for nearly four years, until she was released in December 2011.  Over the course of these various admissions, plaintiff was diagnosed with personality disorder; paranoid schizophrenia; schizoaffective disorder, bipolar type, with psychotic features; attention deficit hyperactivity disorder; borderline personality disorder; antisocial personality disorder; passive aggressive personality traits; major depressive disorder; and alcohol and cannibis dependence and opioid abuse.

Plaintiff's December 8, 2011 discharge from EMSH to a group home in Booneville, Mississippi, was short-lived.  In February 2012, within two months of this placement, she was admitted to NMSH on an involuntary commitment order due to her "risky, exacerbated symptoms of paranoia, physical aggression and threatening behaviors at the personal care home.  Suicidal ideation and intent was also indicated."[5]  Upon admission, her diagnoses included mood disorder, secondary to head injury; post

---

[5]     With her Rule 7 reply, plaintiff provided a copy of a report of a June 30, 2014 psychological evaluation of plaintiff conducted by Beverly Magee.  The information contained herein regarding plaintiff's psychiatric diagnoses and history of hospitalizations and treatment is drawn from that report.

traumatic stress disorder; major depressive disorder, severe, without psychotic features; cannibis abuse and alcohol dependence, in late remission; and "strong" borderline personality disorder. Following a brief period of hospitalization, during which it was noted that she had developed a sufficient theraputic response to her medication regimen, plaintiff was discharged on an outpatient commitment order back to the personal care home, with follow-up at the local mental health center. However, on March 21, 2012, her outpatient commitment order was revoked due to treatment noncompliance and she was readmitted to NMSH. Records reflect that while at the personal care home, she had refused to take her medication, demonstrated suicidal ideation and threatened to kill residents. After two weeks at NMSH, plaintiff was again released to the personal care home on an outpatient commitment order, but she was returned to NMSH ten days later, again due to medication noncompliance, suicidal threats, threats to kill residents at the personal care home, threats to hit staff/residents and general noncompliance. This stay at NMSH lasted three weeks, during which she was initially extremely agitated, angry, impulsive and attention seeking. However, toward the end of this hospitalization, "she was observed to do relatively well apart from her Borderline Personality traits and relational patterns...."

On June 6, 2012, one month following her May 7, 2012 release to the personal care home, plaintiff was re-admitted to NMSH after she attacked another resident and a counselor and otherwise exhibited aggressive behavior.  Upon admission, she appeared slightly over-sedated but would become easily agitated and excited.  After a week, she was noted to "remain defiant, and impulsive, with frequent behavioral problems..."  It was reported that during the course of her hospitalization, she had "improved behavioral control and self government ... although she continued to exhibit occasional but short lived eposides of attention seeking behavior."

On July 9, 2012, plaintiff was discharged from NMSH pursuant to Director Callens' certification that she "had been examined by members of the staff" of NMSH and in Director Callens' judgment, she no longer posed a substantial threat of physical harm to herself or others; that she could "no longer benefit from treatment and services provided by" NMSH; and that she "may be treated at a less restrictive environment" than NMSH.  Regarding a proposed "[d]ischarge plan and suggested after-care", the certificate recited that plaintiff would be discharged to Creation Elite personal care home in Jackson, Mississippi, and that Creation Elite would arrange for her after-care.

Following her discharge, NHMS assisted plaintiff in moving to Creation Elite but had no further involvement in her care from that point forward.[6]  Because she was not the subject of an outpatient commitment order from a chancery court and was released without requirements and conditions to live freely in the community, plaintiff was not required to remain at Creation Elite and could have lived anywhere she chose.  However, she continued to reside at Creation Elite for nine months, until March 13, 2012, when Creation Elite's owner/administrator Belinda Hunter moved her to an apartment in Clinton, Mississippi after plaintiff alleged she had been raped and was pregnant by a staff member at Creation Elite.[7]  Using plaintiff's social security proceeds, Hunter leased the apartment for plaintiff and gave her medications to the apartment manager to dispense.  Plaintiff alleges that within two weeks, the apartment manager threw her out.  She was picked up by a woman she met panhandling at a McDonald's restaurant, and for two months, she stayed at the woman's home, sleeping on her couch.

_____

[6]     Defendants explain that personal care homes such as Creation Elite are privately owned homes or apartments which rent rooms to tenants and provide basic assistance with daily activities, assist in arranging health care, and may provide transportation to medical appointments.  Some are licensed by the State, but they are not required to be.  According to defendants, a resident's relationship with a personal care home is materially identical to that of a traditional landlord-tenant:  the resident may choose whether or not to live in the home, and while residing there, is not physically restrained or otherwise confined to the home.

[7]     The parties state that there is doubt as to the veracity of her rape charge and say there is no evidence she was ever pregnant.

However, she  was unmedicated and became psychotic.  On May 25, 2013, she left the woman's home and was struck by a hit-and-run driver in the middle of Raymond Road, resulting in a fractured pelvis and humerous.  After spending several months at University of Mississippi Medical Center and convalescing in a rehabilitation facility, Creation Elite's owner, Hunter, picked her up but there was an issue with obtaining her medications through Medicaid; so Hunter returned her to Clinton.  Shortly thereafter, plaintiff was arrested for shoplifting and was held for forty-five days in the Hinds County Detention Center, "serving off" her fine.  Her father eventually located her there and in January 2014 filed an affidavit for involuntary commitment, which resulted in her commitment to Whitfield, where she remains.

Plaintiff's Claims

Plaintiff vaguely alleged in her complaint that

Defendants' deliberate actions and/or decisions
regarding provision of care resulted in Susan Biggs
being denied her right to appropriate treatment,
minimally adequate habilitation, and her historic
liberty interests including safety, in violation of the
protections guaranteed by the Fourteenth Amendment....
...
[T]he actions of the Defendants ... constituted a grave
derogation of professional judgment regarding the
medical needs of Ms. Biggs.  This subjected her to
unconstitutional infringement of her own liberty
interests in safety, well-being, liberty and freedom of
movement, as well as her constitutionally guaranteed
rights to appropriate treatment and minimal habilitation
as one who has been committed to the State.

8

She complained, somewhat more particularly, that the decision "that she should be transferred out of inpatient resident care at NMSH ... and placed at Creation Elite Personal Care Home ... did not comport with prevailing professional standards and judgment and thereby deprived her of her Constitutionally guaranteed rights...."

On motion of defendants, the court ordered that plaintiff file a Rule 7 reply to set forth facts which, if true, would overcome defendants' qualified immunity defense.  In her Rule 7 Reply, plaintiff asserts that "it is her final discharge from ... NMSH ... that forms the basis for" her complaint.  She claims that under standards established by the Supreme Court in Youngberg v. Romeo, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), she had a clearly established constitutionally-protected liberty interest in the benefit of professional judgment in the decision whether to discharge her from NMSH.  She maintains that defendants violated this right by discharging her from NMSH and/or discharging her without provision for treatment or follow-up, when, in the exercise of professional judgment, they knew or should have known that she was in need of continued treatment for her mental illness, if not on an inpatient basis then at least as an outpatient; and she contends that as a result, defendants are

liable for the harm that befell her following her discharge.[8]  In a related vein, she contends she had a property interest in continued confinement or in outpatient commitment, rather than an outright discharge, which was violated.  Lastly, she alleges that

---

[8]    In her Rule 7 reply, plaintiff also asserts that under the Supreme Court's decision in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999), she had a clear Fourteenth Amendment right to the benefit of professional judgment in the decision whether or not to continue discharging her to personal care homes.  Pursuant to Title II of the Americans with Disabilities Act (ADA), states must provide disability services in the most integrated setting appropriate to an individual resident's needs.  Id. at 591, 119 S. Ct. at 2183.  The Court held in Olmstead that this means continued institutionalization of a patient will violate the ADA if the patient could receive adequate treatment in a community-based setting.  Id. at 601, 119 S. Ct. 2187.  Conversely, however, "it would be inappropriate to remove a patient from the more restrictive [institutional] setting" if the patient does not meet the essential eligibility requirements for treatment in a community-based program, id. at 602, 119 S. Ct. at 2188.  Plaintiff's reliance on Olmstead is misplaced for a variety of reasons.  First, plaintiff's complaint does not assert an ADA claim against defendants, either in their individual or official capacities.  She cannot use her Rule 7 Reply to add new claims that were not part of her original complaint.  See Ellis v. Crawford, No. 3:03-CV-2416-D, 2007 WL 1624773, at *11 (N.D. Tex. June 6, 2007) ("The Rule 7(a) reply is not a proper vehicle for plaintiffs to raise a new cause of action that they have not been granted leave to add through an amended complaint.").  In any event, she cannot state an ADA claim against defendants in their individual capacities.  See Cole v. Velasquez, 67 F. App'x 252, n.11 (5th Cir. 2003) (noting that "the ADA's comprehensive remedial scheme bars § 1983 claims against state officials in their individual capacities").  Finally, Olmstead was decided under the ADA, not the Due Process Clause.  See Olmstead, 527 U.S. at 588, 119 S. Ct. 2181 ("This case, as it comes to us, presents no constitutional question."); Williams v. Wasserman, 164 F. Supp. 2d 591, 614 (D. Md. 2001) (observing that "the Supreme Court did not reach the due process claim in Olmstead" and therefore, "the touchstone for the court's [due process] analysis remains Youngberg v. Romeo ....").

defendants violated her liberty interest in minimal habilitation by failing to provide her with training during her confinement that would have enabled her to safely live independently in the community.

Qualified Immunmity Standards

The doctrine of qualified immunity protects public officials from civil liability for damages where their challenged conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  The Supreme Court described the concerns that animate the doctrine, stating:

> When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." Harlow v. Fitzgerald, 457 U.S., at 814, 102 S. Ct., at 2736.  On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Ibid.  Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987).  Qualified immunity thus "gives

government officials breathing room to make reasonable but
mistaken judgments about open legal questions." <u>Ashcroft v. al-
Kidd</u>, 563 U.S. 731, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149
(2011).  "When properly applied, it protects 'all but the plainly
incompetent or those who knowingly violate the law.'" <u>Id</u>., 131 S.
Ct. 2074 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 106 S. Ct.
1092, 1096, 89 L. Ed. 2d 271 (1986)).  <u>See also Mitchell v.
Forsyth</u>, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816, 86 L. Ed. 2d
411 (1985) (officials are immune unless "the law clearly
proscribed the actions" they took).  Moreover, qualified immunity
provides immunity from suit, not just from liability.  <u>Mitchell</u>,
472 U.S. at 526, 105 S. Ct. 2806.

    A defendant official who advances a qualified immunity
defense is not required to demonstrate that he did not violate
clearly established federal rights.  <u>Pierce v. Smith</u>, 117 F.3d
866, 872 (5th Cir. 1997).  Instead, while the official must plead
good faith and establish that he was acting within the scope of
his discretionary authority, it is the plaintiff's burden to rebut
the defense of qualified immunity by establishing both that
(1) the official's allegedly wrongful conduct "violated a
statutory or constitutional right" and that (2) "the right was
'clearly established' at the time of the challenged conduct.'"
<u>al-Kidd</u>, 563 U.S. at 735, 131 S. Ct. at 2080.  <u>See also Poole v.
City of Shreveport</u>, 691 F.3d 624, 627 (5th Cir. 2012) ("Public

officials ... are entitled to qualified immunity on summary
judgment unless (1) [the plaintiff] has adduced sufficient
evidence to raise a genuine dispute of material fact suggesting
the officers' conduct violated an actual constitutional right, and
(2) the officers' actions were objectively unreasonable in light
of clearly established law at the time of the conduct in
question.") (internal quotation marks, brackets and citations
omitted).  In assessing whether the plaintiff has met his burden,
courts have discretion in deciding which of these issues to take
up first, Pearson, 555 U.S. at 236, 129 S. Ct. at 818; in some
cases, the better course is to consider first whether the federal
rights alleged to have been violated were clearly established and
perhaps thereby avoid needlessly deciding constitutional
questions.  al-Kidd, 563 U.S. at 735, 131 S. Ct. at 2080
(observing in context of deciding which issue to tackle first that
"[c]ourts should think carefully before expending scarce judicial
resources to resolve difficult and novel questions of
constitutional or statutory interpretation that will have no
effect on the outcome of the case.") (internal quotation marks and
citation omitted); Reichle v. Howard, – U.S. –, –, 132 S. Ct.
2088, 2093, 182 L. Ed. 2d 985 (2012) (citation omitted) (observing
that the discretion allowed by Pearson "comports with our usual
reluctance to decide constitutional questions unnecessarily").

An official's conduct violates clearly established law when, at the time of the challenged conduct, "the law so clearly and unambiguously prohibited his conduct" that "every 'reasonable official would have understood that what he is doing violates [the law].'" al-Kidd, 563 U.S. at 741, 131 S. Ct. at 2083 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality," id. at 742, 131 S. Ct. at 2084. The proper inquiry, instead, is "whether the violative nature of particular conduct is clearly established," id., 131 S. Ct. at 2084. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (per curiam) (internal quotation marks and citation omitted). To illustrate the reason for this fact-specific inquiry, the Supreme Court has observed:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of [qualified immunity].

14

Anderson v. Creighton, 483 U.S. at 639, 107 S. Ct. at 3039.  See also Morgan v. Swanson, 659 F.3d 359, 372 (5th Cir. 2011) (stating that "generalizations and abstract propositions are not capable of clearly establishing the law."); Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015), cert. denied sub nom. Vincent v. City of Sulphur, La., 136 S. Ct. 1517, 194 L. Ed. 2d 607 (2016) (stressing that "[a]bstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case.").

That said, to find that an official's conduct violated clearly established law, "a case *directly* on point is not necessary"; however, "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." Vincent, 805 F.3d at 547 (citing al-Kidd, 563 U.S. at 372, 131 S. Ct. at 2083).  Put another way, the court

> must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.
> Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established. ...  As the Supreme Court explained, "if judges thus disagree on a constitutional question, it is unfair to subject

15

[government officials] to money damages for picking the
losing side of the controversy."

<u>Morgan</u>, 659 F.3d at 371.

In the case at bar, it is manifest that plaintiff has not
alleged or demonstrated the violation of any clearly established
constitutional right.  Indeed, in the court's opinion, she has not
alleged or presented evidence that would establish that any
constitutional right, clearly established or not, was violated.

<u>Due Process</u>

The Due Process Clause has two components:  (1) a procedural
component, which "promotes fairness in government decisions '[b]y
requiring the government to follow appropriate procedures when its
agents decide to 'deprive any person of life, liberty, or
property[,]'" <u>John Corp. v. City of Houston</u>, 214 F.3d 573, 77 (5th
Cir. 2000) (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 331, 106 S.
Ct. 662, 88 L. Ed 2d 662 (1986)); and (2) a substantive component,
which protects against "certain arbitrary, wrongful government
actions regardless of the fairness of the procedures used to
implement them," <u>Lewis v. Univ. of Tex. Med. Branch</u>, 665 F.3d 625,
630 (5th Cir. 2011).  The substantive component "provides
substantive rather than merely procedural protections and comes
into play when 'the behavior of the governmental officer is so
egregious, so outrageous, that it may fairly be said to shock the
contemporary conscience'....".  <u>Jordan v. Fisher</u>, 823 F.3d 805,
810 (5th Cir. 2016), <u>as revised</u> (June 27, 2016).  The protections

16

of the Due Process Clause, whether procedural or substantive, only apply to deprivations of constitutionally protected property or liberty interests.  <u>Klingler v. Univ. of S. Miss.</u>, 612 F. App'x 222, 227 (5th Cir. 2015).  Thus, if an individual does not have a constitutionally protected property or liberty interest, he or she cannot be deprived of due process and thus cannot maintain a § 1983 action.  <u>Id</u>.

    <u>Liberty Interest: Involuntary Inpatient Commitment</u>

    It is unclear whether plaintiff contends she had a constitutional right to remain involuntarily committed to NMSH. That appears to be the position espoused in her complaint and Rule 7 reply.  In her response to defendants' summary judgment motion, she similarly asserts that she had a right "to proper care, treatment, *and hospitalization* for her mental illness." (emphasis added).  And she plainly states she is asserting that her "substantive liberty interests ... in adequate medical care and treatment, and minimal habilitation" ... were "impugned in the Defendants' general policy of refusing long-term treatment to the mentally ill and disabled," and she complains more specifically, of defendants' decision "that she be moved out of inpatient care" when it was apparent she was "unfit for release."  Despite all this, she purports to disavow any claim that she had a right to continued involuntary confinement.  To the extent plaintiff may be asserting a due process claim based on an alleged deprivation of a

claimed liberty interest in continued involuntary confinement, her claim fails, as she plainly had no liberty interest in continued confinement, and certainly no clearly established liberty interest in continued confinement.

The Supreme Court explained in <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), that the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,'" but it does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." <u>Id.</u> at 197, 109 S. Ct. at 1004.  Thus, "'[a]s a general matter, a State is under no constitutional duty to provide substantive services to those within its borders.'" <u>Id</u>. at 197, 109 S. Ct. at 1003 (quoting <u>Youngberg v. Romeo</u>, 457 U.S. 307, 317, 102 S. Ct. 2452, 2458, 73 L. Ed. 2d 28 (1982)). <u>See also</u> <u>id.</u> (explaining that the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual" and thus "the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.").

This principle is not absolute; there are "certain limited circumstances" in which "the Constitution imposes upon the State affirmative duties of care and protection to particular individuals." DeShaney, 489 U.S. at 198, 109 S. Ct. at 1004. Specifically, when the state takes a person into custody and holds her against her will through the affirmative power of the state -- such as when the state takes a prisoner into custody, see Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976), or involuntarily commits a patient to a state mental institution, see Youngberg, 457 U.S. 307, 102 S. Ct. 2452 – Ed. 2d 28 (1982) –– the state creates a "special relationship" which gives rise to "a corresponding duty to assume some responsibility for [her] safety and general well-being," DeShaney, 489 U.S. at 200, 109 S. Ct. at 1005. The DeShaney Court reasoned that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney, 489 U.S. at 200, 109 S. Ct. 998. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 201, 109 S. Ct. at 1005-06.

Accordingly, during the time plaintiff was involuntarily institutionalized at NMSH through state legal proceedings, she had a substantive liberty interest under the Fourteenth Amendment to a certain level of care and protection.  Specifically, she had a right to adequate food, shelter, clothing, and medical care, as well as reasonable safety, freedom from unnecessary bodily restraint and minimal habilitation.  See Youngberg, 457 U.S. at 316-17, 109 S. Ct. at 2458.  However, plaintiff had no liberty interest in involuntary commitment.

In Wilson v. Formigoni, 42 F.3d 1060 (7th Cir. 1994), the plaintiff, a patient at a state-operated mental health center, argued that the defendants, by failing to initiate involuntary commitment procedures and commit her as an involuntary patient, deprived her of the substantive due process protections of reasonably safe conditions of confinement accorded to involuntarily committed mental patients under Youngberg.  Id. at 1065.  That is, she claimed she had "a right to be involuntarily committed stemming from the state's obligation to commit one who is unable to care for herself or himself, and that she was deprived of that right without due process of law."  Id. at 1065-66.  The court rejected her claim, stating: "[T]here is no constitutional right to be deprived of liberty--there is no right to be imprisoned, and none to be involuntarily committed in a mental health facility."  Id. at 1066.  Other courts have

similarly recognized that an individual has no liberty interest in involuntary commitment.  See, e.g., Kennedy v. Schafer, 71 F.3d 292, 297 (8th Cir. 1995) ("There is no constitutional right to involuntary commitment, regardless of an individual's mental condition.") (citing Wilson); Amirault v. City of Roswell, No. 6:95-CV-422 MV/RLP, 1996 WL 391986, at *5-6 (D.N.M. July 11, 1996), aff'd, 120 F.3d 270 (10th Cir. 1997) ("It is well settled that there is no right to be deprived of liberty or to be involuntarily committed in a mental health institution.") (citing Wilson).

From the foregoing, the court concludes that plaintiff not only had no clearly established constitutional right remain involuntarily committed at NMSH, she had no constitutional right to be or to remain committed.

Liberty Interest: Outpatient Commitment

Plaintiff suggests she had a liberty interest in receiving mental health services following her discharge from NMSH. However, once she was discharged from NMSH, she no longer had any liberty interest in receiving substantive services from the state. This is precisely what the court held in JL v. New Mexico Department of Health, 165 F. Supp. 3d 996 (D.N.M. 2015), in response to the plaintiffs' claim that their discharges from involuntary state institutionalization implicated a liberty interest protected by the Fourteenth Amendment Due Process Clause.

21

The court concluded that, consistent with the principles set forth

in DeShaney,

> when the state terminates an involuntary commitment, the
> rationale for imposing a special obligation upon the
> state--i.e., that the state has prevented the person
> from caring for himself or herself--likewise expires.
> Therefore, upon termination of an involuntary
> commitment, the corresponding duty to provide
> substantive services that arose upon commitment
> necessarily also ceases, and the general rule that a
> state has no duty to provide its citizens with
> affirmative services or protection again controls.  See
> [Deshaney, 489 U.S.] at 201, 109 S. Ct. 998 (explaining
> "the State does not become the permanent guarantor of an
> individual's safety by having once offered him shelter,"
> and reasoning that simply because "the State once took
> temporary custody [of a minor child pending
> investigation of suspected child abuse] does not alter
> the analysis, for when it returned him to his father's
> custody, it placed him in no worse position than that in
> which he would have been had it not acted at all").

Id. at 1011.  The court further held that

> [t]o the extent that Plaintiffs allege that Defendants
> deprived them of a protected liberty interest by
> discharging them from the Training School and denying
> them the corresponding protection and care that
> accompanied their involuntary commitments, the Court
> holds that the nature of the interests alleged --i.e.,
> interests in remaining committed to state custody, being
> entitled to state protection, having the state provide
> food, shelter, medical care, and habilitation services,
> being placed in the least restrictive setting, and
> receiving the opportunity to associate with family and
> peers – is the equivalent of a claim of entitlement to
> receive substantive services from the state.  Upon
> Plaintiffs' discharges, however, DeShaney compels the
> Court to conclude that Plaintiffs no longer possessed
> liberty interests in receiving any substantive services
> from the state.  For these reasons, Plaintiffs have
> failed to allege that their discharges from the Training
> School deprived them of any constitutionally-protected
> liberty interest.

<u>Id</u>.  Here, plaintiff had no liberty interest – and no clearly established liberty interest -- in receiving services or treatment once she was discharged from NMSH and accordingly, defendants did not violate plaintiff's substantive due process rights in failing to provide such services.

<u>Liberty Interest: Minimal Habilitation</u>

Plaintiff contends that defendants violated her substantive liberty interest in minimal habilitation while committed.  Under <u>Youngberg</u>, mentally ill individuals confined to state institutions have a constitutionally protected liberty interest in conditions of reasonable care and safety, freedom from unreasonable bodily restraint, as well as such minimally adequate training or habilitation that will ensure these interests.  457 U.S. at 324, 102 S. Ct. at 2462.

Plaintiff argues that she

was not given training adequately to reasonably prepare her to live safely in a less restrictive environment – let alone for being completely released and taken out from under purview of the Court and the mental health system, as evidenced by the fact that she quickly became a vagrant, was run down in the street, then lost and finally found in a local jail.

However, courts have generally recognized that the right to habilitation recognized in <u>Youngberg</u> is limited "'to habilitation which is minimally adequate to <i>maintain</i> basic self-care skills.'" <u>Mihalcik v. Lensink</u>, 732 F. Supp. 299, 303 (D. Conn. 1990) (quoting <u>Thomas S. by Brooks v. Flaherty</u>, 699 F. Supp. 1178, 1201

(W.D.N.C. 1988)).  In <u>Society for Good Will to Retarded Children,</u>
<u>Inc. v. Cuomo</u>, the Second Circuit explained that in his concurring
opinion in <u>Youngberg</u>, Justice Blackmun, joined by Justices Brennan
and O'Connor, "suggested that the state may be required to provide
training necessary to *preserve* basic self-care skills (such as
dressing and toileting oneself) that an individual possessed when
he or she entered a facility for the mentally retarded."  737 F.2d
1239, 1250 (2d Cir. 1984) (citing <u>Youngberg</u>, 457 U.S. at 327-29,
102 S. Ct. at 2464 (Blackmun, J., concurring)(referring to "such
training as is reasonably necessary to prevent a person's
pre-existing self-care skills from deteriorating").  To the
court's knowledge, no court has found that the right to
habilitation or training is any more expansive than this.
Plaintiff herein does not allege that her basic self-care skills
deteriorated during her commitment to NMSH.  Rather, her claim is
that defendants never provided her the training she would need to
enable her to live independently.  Plaintiff had no constitutional
right, much less a clearly established constitutional right, to
that level of training or habilitation.

    <u>Property Interest: Involuntary Commitment</u>

    Plaintiff appears to take the position that by discharging
her and/or by discharging her without an outpatient commitment
order, when she was obviously in need of further treatment,

defendants deprived her of a state-created property interest in

involuntary outpatient commitment.

> The Due Process Clause does not protect everything that
> might be described as a 'benefit':  To have a property
> interest in a benefit, a person clearly must have more
> than an abstract need or desire and more than a
> unilateral expectation of it.  He must, instead, have a
> legitimate claim of entitlement to it.  Such
> entitlements are, of course, not created by the
> Constitution.  Rather, they are created and their
> dimensions are defined by existing rules or
> understandings that stem from an independent source such
> as state law.

Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756, 125 S.

Ct. 2796, 162 L. Ed. 2d 658 (2005) (citations, alterations, and

quotation marks omitted).  In evaluating the source of an alleged

property interest, the existence of discretion is key:

> "[I]f government officials may grant or deny [the
> interest] in their discretion," the interest is not
> protected by due process. [Castle Rock, 545 U.S. at 756,
> 125 S. Ct. 2796] (citation omitted).  "In determining
> whether statutes and regulations limit official
> discretion ... we are to look for "explicitly mandatory
> language," i.e., specific directives to the
> decisionmaker that if the regulations' substantive
> predicates are present, a particular outcome must
> follow.'"  Ridgely v. FEMA, 512 F.3d 727, 735-36 (5th
> Cir. 2008) (quoting Ky. Dep't of Corr. v. Thompson, 490
> U.S. 454, 463, 109 S. Ct. 1904, 104 L. Ed. 2d 506
> (1989)).

Anderton v. Texas Parks & Wildlife Dep't, 605 F. App'x 339, 346-47

(5th Cir. 2015).  See also Hampton Co. Nat. Sur., LLC v. Tunica

Cty., Miss., 543 F.3d 221, 226 (5th Cir. 2008) ("No discretion in

the official and a reasonable expectation in the citizen are

central elements of a protected property interest.") (citing <u>Town of Castle Rock</u>, 545 U.S. at 756, 125 S. Ct. 2796)).

Under Mississippi's civil commitment procedures, if a chancery court orders a person involuntarily committed to a state mental hospital, the director of the hospital has no authority to override that decision.  <u>See</u> <u>Attorney Gen. v. In Interest of B.C.M.</u>, 744 So. 2d 299, 302 (Miss. 1999).  However, once the individual has been admitted to the facility, the facility director must decide whether the patient should remain committed, whether there are alternatives to inpatient commitment or whether the patient should be discharged.  If the director determines that the patient is in need of continued hospitalization, he must give notice to the patient and her family, who may then request a hearing.  Miss. Code Ann. § 41-21-83.  In that event, following a hearing, "the commitment may be continued," but only if the court finds by clear and convincing evidence that:

> (a) the person continues to have mental illness or have an intellectual disability; and (b) involuntary commitment is necessary for the protection of the patient or others; and (c) there is no alternative to involuntary commitment.

Miss. Code Ann. § 41-21-83.  Either party has a right to appeal a final commitment order.  <u>Id</u>.

Two statutes address a treatment facility's discharge of a patient from the facility following an initial court-ordered commitment.  Section 41-21-82 states that prior to the termination

of the initial commitment order--which expires after three months--the director of the facility

> shall cause an impartial evaluation of the patient to be made in order to assess the extent to which the grounds for initial commitment persist, the patient continues to have mental illness, and alternatives to involuntary commitment are available.  If the results of this impartial evaluation do not support the need for continued commitment, the patient *shall be discharged*.

Miss. Code Ann. § 41-21-82 (emphasis added).  Mississippi Code Annotated § 41-21-87, entitled "Discharge at initiative of director," states:

> The director of ... the treatment facility where the patient is committed ... *may* discharge any civilly committed patient upon filing his certificate of discharge with the clerk of the committing court, certifying that the patient, *in his judgment*, no longer poses a substantial threat of physical harm to himself or others.

Miss. Code Ann. § 41-21-87(1) (emphasis added).  He also "*may* return any patient to the committing court" when, "*in [his] judgment,*" the patient may be treated in a "less restrictive environment" or adequate facilities or treatment are not available at the treatment facility, and the director certifies the same to the court.  Miss. Code Ann. § 41-21-87(2)(a)&(b) (emphasis added). His discharge decision, by statute, is not subject to review.  <u>See</u> Miss. Code Ann. § 41-21-87(3).

Under the cited statutes, where the results of an impartial evaluation do not support the need for continued commitment, a facility director has no discretion to continue to hold a patient

27

for treatment.  Conversely, he clearly has discretion to decide whether to discharge a patient, and whether or not to seek an outpatient commitment order.  Notwithstanding this, plaintiff cites to the Mississippi Constitution and to various other state statutes governing involuntary commitment procedures which she contends gave her a clearly established property interest in proper care and treatment for her mental illness, including the right to involuntary hospitalization and/or community-based services.  However, she has failed to identify any state constitutional provision, statute or regulation which entitled her to be civilly committed, either on an inpatient or outpatient basis.

Plaintiff first points to Article IV, § 86, of the Mississippi Constitution, which broadly directs that "[i]t shall be the duty of the legislature to provide for the treatment and care of the insane."  Miss. Const. Art. IV § 86.  However, as defendants correctly note, while this provision may mandate a duty of care for the mentally ill in general, see In Interest of B.C.M., 744 So. 2d at 302, it does not create an individualized right to certain medical treatment.

Next, after observing that the legislature has "chosen the directors of the relevant state institutions to serve as the agents of the state to fulfill [the State's] constitutional duty" to care for the mentally ill, id., she directs the court to

28

Mississippi Code Annotated § 41-21-77.  This statute merely provides that once an individual has been involuntarily committed, she is to be "delivered immediately to the director of the appropriate facility" but if the assigned facility is not immediately available, then while "awaiting admission," she "may be given any such treatment in the facility by a licensed physician as is indicated by standard medical practice."  Miss. Code Ann. § 41-21-77.  This statute is plainly inapplicable, as plaintiff was not denied services "while awaiting admission".

Plaintiff also cites § 41-21-102(6), which generally recites that "[a] person receiving services under Sections 41-21-61 through 41-21-107 has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further custody, institutionalization, or other services unnecessary."  While this provisions establishes a standard of care for services rendered, it does not mandate the provision of specific services either in an involuntary inpatient commitment setting or in the community.

Further, while plaintiff claims that § 41-21-87(6) established a "mandatory requirement" that upon her discharge from NMSH, "[she] be referred to a community mental health center" for services, the cited statute imposed no such requirement.  Instead, this statute requires that each month, mental health facilities operated by the Mississippi Department of Mental Health "shall

provide the directors of community mental health centers the names
of all individuals who were discharged to their catchment area
with referral for community-based services." Miss. Code Ann.
§ 41-21-87(6). Community mental health care providers, in turn,
are to report monthly the date and type of services provided. Id.
By its clear terms, this provision requires only that community
mental health centers be given the names of persons who, upon
discharge from a state mental hospital, have been referred for
community services; it does not mandate that all persons
discharged from a state mental hospital be referred for community
services.

In the court's opinion, it is clear from the foregoing that
plaintiff has not asserted a legitimate, constitutionally
protected claim of entitlement to continued inpatient commitment
at NMSH or to an involuntary outpatient commitment order.
Certainly, she has not demonstrated a clearly established property
interest in continued commitment. Rather, she has merely alleged
that in July 2012, she had a unilateral expectation that she would
not be released from NMSH or that, upon her release, she would be
involuntarily committed for outpatient treatment.

No "Special Relationship" Post-Discharge

Biggs argues that even after she was discharged to Creation
Elite in July 2012, she remained in NMSH's involuntary custody
because the nature of her mental illness limited or negated her

30

ability to make an informed decision about her treatment and where she would/could reside.  That is, she maintains that, owing to her mental illness, she was "incapable of consenting to defendants' discharge plan" and hence remained in NMSH's de facto custody. Some cases have recognized that "a voluntarily committed patient can become a *de facto* involuntary patient if her freedom was--or, in some circuits, could have been--curtailed by the power of the State." <u>Campbell v. Washington</u>, No. C08-0983-JCC, 2009 WL 2985481, at *5 (W.D. Wash. Sept. 14, 2009), <u>aff'd sub nom</u>., <u>Campbell v. State of Washington Dep't of Soc. & Health Servs.</u>, 671 F.3d 837 (9th Cir. 2011).  Here, however, plaintiff does not contend that the State, following her discharge from NMSH, acted to prevent her from leaving Creation Elite.  She claims only that the nature of her own mental illness negated her freedom to leave.  Similar arguments have been explicitly rejected by a number of courts, including the Fifth Circuit.  See <u>Randolph v. Cervantes</u>, 130 F.3d 727, 730 (5th Cir. 1997) (holding that "the mere fact that [plaintiff's] mental condition may have made her functionally dependent on [defendants] does not transform her voluntary tenancy at [a state run apartment] into an involuntary confinement"); <u>Monahan v. Dorchester Counseling Ctr., Inc.</u>, 961 F.2d 987, 992 (1st Cir. 1992) (finding no special relationship where the mental patient's dependency on his caretakers resulted from his own mental condition and where "[h]is helplessness was not

31

attributable to the state's having taken him into custody involuntarily"); Campbell, 2009 WL 2985481, at *7 ("Incapacity alone does not create *de facto* involuntary commitment, because this ... only speaks to the individual's condition, not the State's power.  Only the latter is an appropriate locus for a due process inquiry.").

Plaintiff argues that her circumstance is distinguishable, because she was never voluntarily committed but rather was in the involuntary custody of the state.  The court is not persuaded.  In Estate of Emmons v. Peet, 950 F. Supp. 15 (D. Me. 1996), the plaintiff's decedent initially had been involuntarily committed to a state mental hospital.  After the initial term of commitment expired, he remained at the facility, notwithstanding that the hospital did not apply to the court to maintain him as an involuntary patient.  Id. at 17.  A few days later, he committed suicide.  Id.  The decedent's representative sued under § 1983 for violation of the decedent's due process rights, arguing that at the time of his death, the decedent was a "de facto involuntary ward of the State who possessed the substantive due process right to receive adequate medical care" since he was "unaware of his right [to leave the hospital] due to his mental illness and consequently was confined in fact to [the hospital] as if he were an involuntary patient."  Id. at 19.  The court rejected this argument, reasoning that since it was the decedent's

"own mental condition alone that impinged upon his
freedom to leave, ... the *Constitution* did not impose
upon [the State] any responsibility for his safety and
well-being." [Monahan v. Dorchester Counseling Center,
Inc.,] 961 F.2d 987, 992 (1st Cir. 1992) (citing
DeShaney v. Winnebago County Dep't of Social Servs., 489
U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). ...
For substantive due process purposes, [his] awareness of
his voluntary status or his ability to understand the
nature of his voluntary status are irrelevant.

Emmons, 950 F. Supp. at 19.

Plaintiff herein alleges only that the limitations of her own
mental illness prevented her from leaving Creation Elite or, for
that matter, from making any decisions regarding her own care.
However, as her freedom was not curtailed in any manner *by the
State* following her discharge from NHSM, she was not in the
State's de facto custody and the State thus had no duty to provide
her care and services, including protection from harm.

Alleged Procedural Due Process Violations

In her response to the motion, plaintiff asserts that
defendants violated various procedural requirements of
Mississippi's civil commitment statutes and thereby violated her
procedural due process rights. She claims, for example, that
defendants failed to give notice prior to discharging her, as
required by Mississippi Code Annotated § 41-21-87(4) (providing
that within 24 hours prior to the release or discharge of any
civilly committed patient, "the director shall give or cause to be
given notice of such release or discharge to one (1) member of the

33

patient's immediate family...”).  However, as with her substantive due process claim, plaintiff has no viable procedural due process claim since she has no federally protected property or liberty interest.  <u>See</u> <u>Klingler</u>, 612 F. App'x at 227.  Moreover, as defendants correctly note, the Due Process Clause does not require a state to implement its own law correctly.  <u>See</u> <u>FMProperties Operating Co. v. City of Austin</u>, 93 F.3d 167, 174 (5th Cir. 1996).

<u>Conclusion</u>

Based on all of the foregoing, the court concludes that defendants' motion for summary judgment on the basis of qualified immunity should be granted.

Accordingly, it is ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 20th day of October, 20 16.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

34